#### IN THE UNITED STATES DISTRICT COURT
#### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ATCM OPTICAL, INC., OMEGA OPTICAL, INC., OMEGA OPTICAL AT COMCAST CENTER LLC d/b/a OMEGA OPTICAL, : *Plaintiff*, : v. : : TWIN CITY FIRE INSURANCE COMPANY, : *Defendant*. : | | Civil Action  20-4238 |

#### MEMORANDUM

**Kenney, J.**                                                                                           **January 14, 2021**

Like many Philadelphia and Pennsylvania businesses, Plaintiff ATCM Optical, Inc., Omega Optical, Inc., Omega Optical at Comcast Center LLC d/b/a Omega Optical ("Omega") was forced to close in March 2020 due to shutdown orders issued by the Governor of Pennsylvania and the Mayor of Philadelphia in response to the COVID-19 pandemic. Omega suffered business income losses and sought indemnity from its insurance carrier, Twin City Fire Insurance Company ("Twin City") under its all-risk commercial property policy ("Policy"). Twin City denied Omega's claims.

Omega then brought this action under our diversity jurisdiction seeking a declaration that Twin City must cover the business losses resulting from the mandatory closing of its stores under the shutdown orders.[1] Twin City moves to dismiss the Complaint for failure to state a claim, arguing Omega's losses are not covered by the terms of its Policy. Omega opposes the motion. Having considered Twin City's Motion, Omega's response in opposition, and Twin City's reply, we will grant Twin City's Motion because Omega's claims are not covered by the terms of its Policy.

---

[1] Because the parties are completely diverse and the amount in controversy exceeds $75,000, this Court has jurisdiction under 28 U.S.C. § 1332(a).

I.      **Factual and Procedural Background**[2]

Omega operates, owns, and manages two optical offices in Philadelphia, Pennsylvania. ECF No. 1 ¶ 8. In July 2019, Twin City issued an all-risk commercial property insurance policy ("Policy") to Omega for its two Philadelphia locations. The Policy provided property, business personal property, business income, extra expenses and other coverage through July 2020.[3] *Id.* ¶¶ 10, 14.

On March 6, 2020, Pennsylvania Governor Tom Wolf issued a Proclamation of Disaster Emergency. *Id.* at ¶ 61. The City of Philadelphia first issued restrictions on the operations of non-essential businesses to mitigate the spread of COVID-19 on March 16, 2020. *Id.* ¶ 62. Omega was forced to cease its operations and close its doors at both its locations under the City's Order. *Id.* ¶ 62. The City of Philadelphia and Pennsylvania Governor Wolf issued subsequent orders (collectively "Civil Authority Orders") requiring Omega—a "non-essential" and "non-life sustaining business"— to remain closed except to provide emergency optical services. *Id.* ¶¶ 63–65, 77. On June 5, 2020, the City of Philadelphia permitted Omega and similar businesses to reopen so long as the businesses followed certain safety protocols. *Id.* ¶ 66.

Omega filed this action seeking a declaration that its business losses were covered. *See* Compl., ECF No. 1. Twin City responded with a Motion to Dismiss. ECF No. 8.

---

[2] We "accept as true all allegations in plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and construe[] them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). We draw the following facts from the Complaint and the attached exhibits. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complaint's claims are based upon these documents.").

[3] Omega appended "Spectrum Policy Declarations" to its Complaint rather than a copy of its complete Policy. *See* ECF No. 1-5 Ex. 1. Twin City however attached the Policy in full as an exhibit to its motion papers. *See* ECF No. 8-2 Ex. A. Twin City issued Policy No. 13 SBA IN4046 DW to Plaintiff for the policy period July 20, 2019 to July 20, 2020. Citations to the Policy are to the Policy attached as Exhibit A to Twin City's Memorandum in Support of its Motion to Dismiss, ECF No. 8-2.

## II. Standard of Review

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010)) (internal quotation marks omitted). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) we "must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;' " (2) we "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;' " and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675).

In ruling on a motion to dismiss, we may "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Guidotti v. Legal Helpers Debt Resolution*, L.L.C., 716 F.3d 764, 772 (3d Cir. 2013)).

## III. Discussion

The issue before us is one of contract interpretation. The interpretation of an insurance contract is a question of law. *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 320 (3d Cir. 2011). We must interpret the plain language of the insurance contract read in its entirety, giving effect to all

its provisions. *Id.* We are to construe the words of the policy "in their natural, plain, and ordinary sense" meaning. *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999).

When the policy language is "clear and unambiguous," we must "give effect to that language." *401 Fourth Street v. Inv'rs Ins. Co.*, 879 A.2d 166, 170 (Pa. 2005). When policy language is ambiguous, we are to construe the provision against the insurer and in favor of the insured. *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 677 (3d Cir. 2016). A policy is ambiguous where it is reasonably susceptible to more than one construction and interpretation. *Madison Const. Co.*, 735 A.2d at 106. Policy language may not be stretched beyond its plain language to create an ambiguity. *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 164 (3d Cir. 2011). Mere disagreement between the parties about the meaning does not make the policy language ambiguous. *Id*.

The guiding principle in interpreting an insurance contract is to effectuate the reasonable expectations of the insured. *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 903 (3d Cir. 1997) (citations omitted). Under Pennsylvania law, even if the terms of the insurance contract are clear and unambiguous, the insured's reasonable expectations may prevail over the express terms of the contract. *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir. 1994). Even so, the insurance contract's language itself serves as the best evidence of the parties' reasonable expectations. *Safe Auto Ins. Co. v. Berlin*, 991 A.2d 327, 332 (Pa. Super. 2010) (citation omitted).

As the insured, Omega has the initial burden of establishing coverage under the policy. *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009). Where the insured meets that burden and the insurer relies on a policy exclusion as the basis for denying coverage, the insurer then has the burden of proving that the exclusion applies. *Id*.

**A. Coverage**

Omega asserts coverage under the business income, extra expense, and civil authority provisions of the policy. Compl. ¶¶ 95–96. Twin City contends that Omega has no covered loss under those provisions and relies on the virus exclusion as a basis for denying coverage. ECF No. 8-1 at 12–16, 16–18. Arguing that the virus exclusion expressly applies to the civil authority, business income and extra expense provisions, Twin City asserts that the exclusion bars coverage. *Id.*

Pennsylvania law requires that we first determine whether Omega has met its burden of establishing coverage under the business income, extra expense or civil authority provisions before considering whether the virus exclusion applies. *State Farm*, 589 F.3d at 111. Under the Policy, Twin City "will pay for direct physical loss of or physical damage to Covered Property at the premises... caused by or resulting from a Covered Cause of Loss." Policy at 34. The Policy defines "Covered Cause of Loss" as used in the quoted provisions as "RISKS OF DIRECT PHYSICAL LOSS" unless otherwise excluded from coverage or limited by another provision. *Id.* at 35 (all caps in original).

> The Policy's additional coverage for Business Income states:
>
> [Twin City] will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", caused by or resulting from a Covered Cause of Loss.

*Id.* at 43. The Policy further provides:

> We will pay reasonable and necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or physical damage to property at the "scheduled premises"…caused by or resulting from a Covered Cause of Loss.

*Id*. The Policy defines "operations" and "period of restoration." "Operations" means, in part, the "business activities occurring at the [insured property]." *Id.* Form SS 00 07 07 05, at p. 24 of 25.

"Period of restoration" means, in part, "the period of time that begins with the date of the direct physical loss or physical damage caused by or resulting from a Covered Cause of Loss at the [insured property]" ending on either the date when the property "should be repaired, rebuilt, or replaced with reasonable speed and similar quality" or "[t]he date when business is resumed at a new permanent location." *Id.*

Omega's Policy also includes a provision governing covered losses flowing from actions of a "civil authority":

> This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "scheduled premises".
>
> The coverage for Business Income will begin 72 hours after the order of a civil authority and coverage will end at the earlier of:
>
> (a) When access is permitted to your "scheduled premises"; or
>
> (b) 30 consecutive days after the order of the civil authority.

*Id*. at 44.  The business income and extra expense coverage are triggered when there is a suspension of Omega's operations caused by direct physical loss of or damage to its insured properties. Its civil authority provision applies when a civil authority issues an order prohibiting access "as the direct result of a Covered Cause of Loss [defined as 'risks of direct physical loss']."

The coverages share essential elements. Both business income and extra expense coverage is predicated on damage to property. The business income provision requires the suspension of operations caused by "direct physical loss of or damage to property" of the insured, while the extra expense provision covers costs incurred as a result of "direct physical loss or physical damage to property." Each coverage also depends on the existence of a "covered cause of loss" as defined in the policy. The civil authority coverage applies only when the damage to other property that

instigated the government order was caused by a "covered cause of loss." Likewise, the business income coverage and extra expense coverage apply when operations are suspended as a result of loss or damage caused by a "covered cause of loss."

### 1. Loss of or Damage to Property

The business income and extra expense provisions apply when business losses are caused by "direct physical loss of or damage to property" of the insured. The parties' dispute comes down to the meaning of "direct physical loss of or physical damage to…property" and whether Omega has sufficiently alleged such loss or damage. Our Court of Appeals' precedent is instructive here. In *Port Authority of New York and New Jersey*, the Circuit addressed whether the presence of asbestos in a building constituted "direct physical loss of or damage to" property under New Jersey law. *Port Auth. of N.Y. & N.J. v. Affiliated MF Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002). The Court explained that "[i]n ordinary parlance and widely accepted definition, physical damage to property means distinct, demonstrable, and physical alteration of its structure." *Id.* (quoting 10 Couch on Ins. § 148:46 (3d ed. 1998)). Damage by sources unnoticeable to the naked eye must "meet a higher threshold" than "typical examples of physical damage from an outside source that may demonstrably alter the components of a building." *Id*. at 235.

The plaintiff alleging physical loss or damage "by sources unnoticeable to the naked eye" bears the burden of establishing its structure was physically damaged by "meet[ing] a higher threshold." *Id.* at 232, 235. In *Port Authority*, our Court of Appeals determined that asbestos causes physical loss or damage if it is present in such large quantities that it makes the structure "uninhabitable and unusable." *Id.* at 236. If, however, the structure continues to function and remains usable then the building owner has not suffered a loss. *Id.* at 236. The "mere presence of asbestos, or the general threat of future damage from that presence, lacks the distinct and

demonstrable character necessary for first-party insurance coverage." *Id*. The test proposed by *Port Authority* is consistent with Pennsylvania law. *See Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826 (3d Cir. 2005) (finding an issue of material fact existed as to whether a house's functionality was nearly eliminated or destroyed, or made useless or uninhabitable, by the presence of e coli in a well).

We agree with and adopt our sister court's conclusion that, "under Pennsylvania law, for Plaintiffs to assert an economic loss resulting from their inability to operate their premises as intended within the coverage of the Policy's 'physical loss' provision, the loss and the bar to operation from which it results must bear a causal relationship to some *physical condition* of the premises." *4431, Inc. et al v. Cincinnati Ins. Cos.*, No. 5:20-cv-04396, 2020 WL 7075318, at *11 (E.D. Pa. Dec. 3, 2020) (emphasis in original). There must also be an "element correlating to [the] extent of operational utility – i.e., a premises must be uninhabitable and unusable, or nearly as such." *Id*; *see also Brian Handel D.M.D. v. Allstate Ins. Co.*, No. 20-3198, 2020 WL 6545893 (E.D. Pa. Nov. 6, 2020) (finding *Port Authority* and *Hardinger* preclude a finding of "direct physical loss of or damage to" property where it remained inhabitable and usable, albeit in limited ways). In sum, while structural damage is not required to show "direct physical loss of" or damage to property, the source that destroys, or nearly destroys, the property's utility must have something to do with the physical condition of the premises.

And so we look to Omega's complaint to determine whether well-pleaded facts show alleged damage or losses that "bear some causal connection to the physical condition of the premises" and whether those conditions "operate[d] to completely or near completely preclude operation of the premises as intended." *4431, Inc.*, 2020 WL 7075318, at *10. Omega alleges its

"losses were not directly caused by a virus, bacterium or other microorganism [but rather] were caused by the entry of Civil Authority Order[s]." Compl. ¶ 41.

Omega alleges that the Civil Authority Orders "precluded doing any optical work unless the failure to do so would be detrimental to the health of a patient," and adds that it never performed any emergency optical services, which would have required Omega to have Personal Protective Equipment. *Id.* ¶ 77. Omega alleges because the Civil Authority Orders prevented it from using its properties for the intended uses, COVID-19 "has caused direct physical loss of or damage to" its insured properties. *Id.* ¶ 78. It alleges that virus may remain "stable and transmittable" on surfaces for days and infected droplets and particles carrying the virus, although invisible to the naked eye, "are physical objects which travel to other objects and cause harm. " *Id.* ¶¶ 47, 52.  Its insured properties, Omega alleges, have been physically impacted because they have been contaminated by COVID-19 and remain at imminent risk of COVID-19 contamination given the nature of its optical practice, which requires "providing services in a close environment where patients, opticians and staff are in close proximity to one another…" *Id.* ¶¶ 81, 83.

This is not loss of or damage to property within the meaning of the Policy. Omega's allegations reveal that it was denied access to its insured properties for non-emergent optical services which caused it to suffer "business losses, business interruption and extended expenses" *Id.* ¶ 89. However, no order by any authority required optical offices like Omega to close completely. Instead, Omega could remain open for emergency procedures. Thus, Omega's property remained inhabitable and usable, albeit in limited ways.

We also note that coverage for actual or threatened COVID-19 contamination makes little sense in connection with the Period of Restoration language, which ties business income coverage eligibility to the period during which the property can be "repaired, rebuilt, or replaced."  Omega's

allegations that COVID-19 "has caused direct physical loss of or damage to" its insured properties by way of the Civil Authority Orders which prevented it from using its properties for the intended uses do not meet the "higher threshold" for property damage from unseen sources. Simply put, there is nothing to repair, rebuild, or replace. *Port Auth.*, 311 F.3d at 235. Once the government orders lifted, Omega's locations reopened (albeit with restrictions and limited capacity) without any repairs, replacements, or rebuilding. Compl. ¶ 66.

Plaintiff has failed to plead plausible facts that COVID-19 caused damage or loss in any physical way to the property so as to trigger coverage under its business income or extra expense provisions as set forth in *Hardinger*, 131 F. App'x at 826-27.

### 2. Covered Cause of Loss

The Policy defines a covered cause of loss as a risk of "direct physical loss" unless the loss is excluded or limited. ECF No. 8-1 at 19–21. Omega argues that the Civil Authority Orders are the covered cause of loss that caused their business losses. ECF No. 15 at 27–29. However, the shutdown orders cannot constitute a covered cause of loss under the civil authority provision to trigger coverage.

To trigger coverage under the civil authority provision, a covered cause of loss must damage another property in the immediate area of the insured property, prompting a civil authority to respond to the covered cause of loss. Further, the insured must be prohibited from accessing the property. Omega alleges "the physical impact of the coronavirus and COVID-19 on [its] insured property and the surrounding property constitutes direct physical loss" that is a covered cause of loss under its Policy. ECF No. 15 at 10–11. We cannot agree. The civil authorities issued their Orders to address the health crisis, not some "direct physical loss."[4] *See, e.g.*, "Proclamation of

---

[4] We reject Omega's conclusory allegations that the Civil Authority Orders were issued to prevent further "physical impact and losses and damage" to property. *See* Compl. ¶ 41; ECF No. 15 at 27–29.

Disaster Emergency," Governor Wolf, Commonwealth of Pennsylvania (March 6, 2020) (stating that it is critical "to implement measures to mitigate the spread of COVID-19"), Compl. Ex. 3 at 2.

Omega has not plausibly alleged a direct physical loss, and without a direct physical loss, there can be no coverage. Further, that Omega could have provided emergency optical services at its insured properties under the Civil Authority Orders reveals that a prohibition on access to the properties—a prerequisite to coverage—is absent here and precludes coverage under the civil authority provision. *See Handel*, 2020 WL 6545893, at *3 ("[P]laintiff's property remained inhabitable and usable, albeit in limited ways.).

We recognize that courts in other jurisdictions have either found coverage under similar policies or allowed cases to survive motions to dismiss. But upon review of those non-binding cases, Omega's Policy, and relevant caselaw from our Court of Appeals, we find that Omega has not met its burden to show prima facie coverage under its Policy.

### B. Virus Exclusion

Even if Omega had asserted coverage under the business income, extra expense or civil authority provisions, the virus exclusion precludes coverage. The Policy contains a virus exclusion providing "[w]e will not pay for loss or damage caused directly or indirectly by any of the following… (1) Presence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus." Policy at 131. The exclusion applies "regardless of any other cause or event that contributes concurrently or in any sequence to the loss" and "whether or not the loss event results in widespread damage or affects a substantial area." *Id.* Referring to the exclusion as the "Fungi Exclusion," Omega argues the exclusion is ambiguous or in the alternative, that dismissing its case

based on the exclusion is premature. *See* ECF No. 15 at 14–23. Omega also makes a regulatory estoppel argument. *Id.* at 30–32.

Omega argues that the exclusion Twin City included in its policy is even more ambiguous than a virus and bacteria exclusion developed by the Insurance Services Office ("ISO") that other insurers included in commercial insurance policies. *Id.* at 14. The ISO-developed virus exclusion provides "[w]e will not pay for loss or damage caused by or resulting from a virus, bacteria or other microorganism that induces or is capable of inducing physical distress, illness or disease." *Id.* Omega points out that the ISO-developed exclusion describes a virus like COVID-19 that is "capable of inducing physical distress, illness or disease" though it omits the mention of a pandemic, and therefore is nonetheless ambiguous. In contrast, the Twin City virus exclusion "does not contain a specific and targeted exclusion for losses caused by a virus capable of causing physical distress, illness or disease as the result of a pandemic" and is therefore comparatively ambiguous. *Id.* at 14–15.

A Third Circuit panel upheld a similarly unambiguous exclusion barring coverage for losses caused by hazardous substances or microorganisms. *See, e.g., Certain Underwriters at Lloyds of London Subscribing to Policy No. SMP3791 v. Creagh*, 563 F. App'x 209, 211 (3d Cir. 2014) (applying microorganism exclusion to bacteria). Our sister court recently upheld a virus exclusion identical to this Policy's as unambiguous in the context of losses caused by COVID-19. *See Wilson v. Hartford Cas. Co.*, No. 20-cv-3384, 2020 WL 5820800, at *7 (E.D. Pa. Sept. 30, 2020) ("[Insurer] will not pay for loss or damage caused directly or indirectly by ... [p]resence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus."). In his

opinion, Judge Robreno noted that several Pennsylvania courts have also "enforced similar exclusions as unambiguous." *Id* (collecting cases).[5]

Finally, exclusions are "effective against an insured if they are clearly worded and conspicuously displayed, irrespective of whether the insured read the limitations or understood their import." *Frederick Mut. Ins. Co. v. Ahatov*, 274 F. Supp. 3d 273, 283 (E.D. Pa. 2017). Just as in *Wilson*, where Judge Robreno found an identical virus exclusion unambiguous, "the Policy language here—including the defined term "specified cause of loss"—is conspicuously displayed, clear, and unambiguous." 2020 WL 5820800, at *7.

Omega concludes that "misleading or inaccurate representations to the Department of Insurance [ ] were used to gain approval of the Fungi exclusion included in Defendant's Policy." ECF No. 15 at 22. Without relying on any facts, Omega asserts that a *potential* regulatory estoppel argument merits further investigation and renders dismissal at this stage inappropriate. Omega explains that it would serve discovery on Twin City and the ISO "regarding how the Fungi exclusion was drafted, any correspondence the ISO and/or Defendant had with each other relating to the Fungi exclusion that Defendant uses and alternative exclusionary language that the ISO recommends, correspondence the ISO and/or Defendant has with Pennsylvania insurance regulators relating to the fungi exclusion, and *whether regulatory estoppel should apply* because of misleading or inaccurate representations to the Department of Insurance that were used to gain approval of the Fungi exclusion included in Defendant's Policy." ECF No. 15 at 22 (emphasis

---

[5] We note also that a number of sister courts have upheld virus exclusions with the ISO-developed provision. *See LH Dining L.L.C v. Admiral Indemnity Company*, 2:20-cv-01869-TJS (Dec. 18, 2020); *Newchops Restaurant Comcast v. Admiral Indemnity Co.*, 2:20-cv-01949-TJS (Dec. 17, 2020); *Kessler Dental Associates P.C. v. Dentists Insurance Company*, 2:20-cv-03376-JDW (Dec. 07, 2020); *Toppers Salon & Health Spa, Inc. v. Travelers Property Casualty Company of America*, 2:20-cv-03342-JDW (Nov. 30, 2020); *Brian Handel DMD PC v Allstate Insurance Company*, 2:20-cv-03198 (Nov. 06, 2020).

added). In other words, Omega argues that dismissal is inappropriate until such time when it learns whether regulatory estoppel applies to bar the application of the virus exclusion.[6]

However, our job at this stage is to determine whether Omega's complaint can survive Twin City's motion to dismiss by containing sufficient factual matter, accepted as true, to state a plausible claim to relief. *Zuber*, 871 F.3d at 258 (quotation omitted). Regulatory estoppel "prohibits parties from switching legal positions to suit their own ends." *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 566 Pa. 494, 781 A.2d 1189, 1192 (2001). If an insurer represented to a regulatory agency that new language in a policy would not result in decreased coverage, the insurer cannot assert the opposite position when insureds raise the issue in litigation. *Hussey Copper, Ltd. v. Arrowood Indem. Co.*, 391 F. App'x 207, 211 (3d Cir. 2010). To establish regulatory estoppel, Omega must allege that the opposing party made a statement to a regulatory agency and later adopted a position contrary to the one presented to the regulatory agency. *Simon Wrecking Co. v. AIU Ins. Co.*, 541 F. Supp. 2d 714, 717 (E.D. Pa. 2008).

Omega satisfies neither element. It fails to satisfy the first element of regulatory estoppel because it has not averred any statements Twin City made to any regulatory agency. It avers that the ISO presented its "Virus Exclusion cause" to state regulatory agencies at some point after the "SARS situation that occurred in or around 2005-2006," Compl. ¶¶ 25–26. Omega also avers that "insurance carriers [marketed the virus exclusion] to insurance regulators." *Id.* ¶ 29. But Omega fails to aver that Twin City itself made any statements, or that the ISO, when presenting its case to state regulatory agencies, presented on Twin City's behalf. *See Handel*, 2020 WL 6545893, at *4 (finding that Plaintiff satisfied the first element where it averred that ISO and American

---

[6] We resist Plaintiff's attempts to introduce extrinsic evidence on the virus exclusion we have found to be unambiguous.

Association of Insurance Services presented to state regulatory agencies in 2006 on behalf of multiple insurers, *including defendant*, to include a virus exclusion in insurance policies).

Even assuming that the ISO's statements could be imputed to Twin City, Omega has not alleged that Twin City is now contradicting the statements the ISO made to state regulatory bodies because it did not identify any particular statements the ISO made to state regulatory agencies. Since Omega has not pleaded facts to satisfy the requisite elements, the doctrine of regulatory estoppel does not apply to this action, and Omega has not stated a claim for regulatory estoppel. *Kessler v. Dentists' Ins. Co.*, No. 20-3376, 2020 WL 7181057, at *3 (E.D. Pa. Dec. 7, 2020).

### C. Leave to Amend

We are to grant leave to amend where justice so requires. Fed. R. Civ. P. 15(a)(2). Where leave to amend would be futile, denial of leave to amend is appropriate. *See Kanter v. Barella*, 489 F.3d 170, 181 (3d Cir. 2007). We will not grant Omega leave to amend its complaint because Omega cannot allege any facts related to its Policy, its losses, or the reasons for its losses that could bring its claim within the coverage of its insurance policy.

### IV. Conclusion

For the foregoing reasons, Omega is not entitled to coverage for the losses it suffered. Its claim for declaratory relief will be dismissed with prejudice.